IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Anthony Domagala, | ) | C/A no.:2:22-999-RMG-MHC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | **(JURY TRIAL DEMANDED)** |
| City of North Charleston; North Charleston Police Department; Reginald L. Burgess, in his individual and official capacities; Jordan G. Williamson, in his individual capacity; Chad S. Lange, in his individual capacity; Steve P. Hall, in his individual capacity; and Daniel Green, in his individual capacity; | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

Plaintiff ANTHONY DOMAGALA alleges against the above-named defendants as follows:

**JURISDICTION AND VENUE**

1. The Plaintiff brings this claim in this Division, because the incident that gave rise to this action occurred in the City of North Charleston, South Carolina. The Plaintiff invokes this Court's concurrent jurisdiction to hear state law and federal question claims arising under the United States Constitution and federal statutes, 42 U.S.C. § 1983, 42 U.S.C. § 1988, and the Fourteenth Amendment to the United States Constitution, 28 U.S.C. 1331, and the South Carolina Tort Claims Act. Venue is proper in this court pursuant to 28 U.S.C. 1391(b).

1

## PARTIES

2.      Plaintiff Anthony Domagala ("Tony") is a citizen and resident of Berkeley County, South Carolina.

3.      Defendant Reginald L. Burgess ("Chief Burgess") is employed as the Chief of Police for the City of North Charleston Police Department and, at all times mentioned herein, was acting in the course and scope of his employment under color of law. Chief Burgess is sued in his individual capacity under 42 U.S.C. § 1983, § 1988, and the Fourteenth Amendment to the United States Constitution, and in his official capacity pursuant to *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978) and its progeny, as well as *Doe v. Rosa*, 795 F.3d 429 (4th Cir. 2015) and its progeny.

4.      Jordan G. Williamson ("Williamson") was employed as a law enforcement officer by the North Charleston Police Department and, at all times mentioned herein, was acting in the course and scope of his employment under color of law. Officer Williamson is sued under 42 U.S.C. § 1983, 1988 and the Fourteenth Amendment to the United States Constitution.

5.      Chad S. Lange ("Lange") was employed as a law enforcement officer by the North Charleston Police Department and, at all times mentioned herein, was acting in the course and scope of his employment under color of law. Officer Williamson is sued under 42 U.S.C. § 1983, 1988 and the Fourteenth Amendment to the United States Constitution.

6.      Steve P. Hall ("Hall") was employed as a law enforcement officer by the North Charleston Police Department and, at all times mentioned herein, was acting in the course and scope of his employment under color of law. Officer Williamson is sued under 42 U.S.C. § 1983, 1988 and the Fourteenth Amendment to the United States Constitution.

7.     Daniel Green ("Green") was employed as a law enforcement officer by the North Charleston Police Department and, at all times mentioned herein, was acting in the course and scope of his employment under color of law. Officer Williamson is sued under 42 U.S.C. § 1983, 1988 and the Fourteenth Amendment to the United States Constitution.

8.     Defendant City of North Charleston ("the City") is a political subdivision of the State of South Carolina as defined by S.C. Code Ann. § 15-78-10, and has facilities in Charleston, South Carolina. At all times relevant to this action, the City acted and carried on its business by and through its agents, servants, and employees, all of whom were acting within the scope of their officially assigned and compensated duties.

9.     Defendant North Charleston Police Department ("NCPD") is a governmental agency and/or political subdivision of the State of South Carolina as defined by S.C. Code Ann. § 15-78-10, and has facilities in Charleston, South Carolina. At all times relevant to this action, NCPD acted and carried on its business by and through its agents, servants, and employees, all of whom were acting within the scope of their officially assigned and compensated duties.

10.    At all relevant times, the City was responsible for the management and operation of NCPD, including policymaking, and the hiring, training, supervision, and retention of officers and was responsible for the actions of all officers of NCPD, including defendants Williamson, Lange, Green, and Hall.

11.    At all relevant times NCPD was responsible for the management and operation of NCPD, including policymaking, and the hiring, training, supervision, and retention of officers and was responsible for the actions of all officers of NCPD, including defendants Williamson, Lange, Green, and Hall.

12. The City and NCPD have a well-documented history of their officers violating applicable policies and unlawfully detaining and searching persons, as well as employing improper, unwarranted, and unconstitutional force against persons.

13. The City and NCPD have been willfully indifferent to the wrongful acts and omissions herein, and/or failed to investigate this or similar acts of misconduct by their officers, and/or failed to take appropriate curative or preventative action with respect to their wrongful acts, all of which fostered an environment where improper and unconstitutional conduct was condoned, tolerated, or emboldened by the policy-making authorities.

**STATEMENT OF FACTS**

14. Chief Burgess is the Chief of the North Charleston Police Department, who is selected by the City Council, funded by the City of North Charleston budget, and operates within Charleston, Berkeley, and Dorchester Counties.

15. Williams, Hall, and Green were hired by or at the direction of Chief Burgess.

16. Lange was hired by or at the direction of Chief Burgess' predecessor Eddie Driggers and remained employed and supervised by or at the direction of Chief Burgess as of the date of the incident giving rise to this action.

17. Hall and Green were hired by or at the direction of Chief Burgess' predecessor Jon Zumalt and remained employed and supervised by or at the direction of Chief Burgess.

18. Williamson, Lange, Hall, and Green were not properly trained on federal or state law or departmental policies or procedures concerning use of force.

19. Chief Burgess failed to ensure the policies of the North Charleston Police Department concerning use of force are consonant with the constitutional protections afforded every citizen of the United States.

20. On March 30, 2020, Lange stopped Tony on I-26. Lange had observed Tony earlier while he was driving through the 10 Mile neighborhood in North Charleston a little after 10PM. He followed Tony as he left the neighborhood but did not turn his dashcam on until Tony was already on I-26 close to the Aviation Avenue exit on I-26. He continued to follow Tony for approximately 2.5 miles before stopping him on the interstate just south of the Ashley Phosphate Road exit.

21. Lange claimed the stop was for making a purported illegal turn at the intersection of Gumwood Boulevard and Rivers Avenue, miles earlier, but according to Lange's own written reports and what Williamson reported to Tony during the roadside encounter, the stop was pretextual in nature. Lange expressed the belief that Tony was in the area to buy drugs and stopped him because he had already watched Tony drive into the neighborhood earlier and determined that because he had spent only a brief time in the neighborhood Tony's presence was suspicious.

22. The stop took place on one of the busiest sections of one of the busiest highways in South Carolina, rather than the surface street where the alleged traffic infraction occurred, miles earlier.

23. When pulled over, Tony was polite and compliant. Lange approached him from the passenger side of the car and asked for Tony's license, registration, and proof of insurance within the first minute of the encounter, all of which were promptly provided.

24. Shortly after the stop, Williamson arrived in his police cruiser and walked to the driver side of the vehicle. Lange and Williamson continued speaking to Tony from either

side of his vehicle. They asked Tony what had brought him to the area, but apparently could not hear him because of the loud highway noise. Thereafter, they asked Tony to step out of the car and asked for consent to search, which Tony gave.

25.     Lange asked Williamson to take control over Tony while he searched Tony's car.

26.     Williamson directed Tony to the front of Lange's patrol car and began to pat Tony down to check for weapons, which Tony denied possessing. During the pat down, Williamson told Tony that they stopped him because they saw him go in and out of the Ten Mile neighborhood in a short period of time. Although frustrated by this weak justification, Tony continued to comply with the putdown.

27.     Williamson continued to question Tony about whether he was involved in any drug activity, which Tony denied, explaining that he was driving around because the COVID-19 pandemic lockdowns had just begun, and he was having "cabin fever." Tony continued to express frustration at the stop and the number of officers who had swarmed him.

28.     Williamson asked Tony to spread his feet, and Tony complied. As Williamson was patting down Tony's upper thigh, he pulled out his flashlight, and then with no explanation abruptly began yelling at Tony, shoving him violently toward the hood of the car and calling for Lange.

29.     Seconds later, the two of them had thrown Tony to the ground, landing on top of him, wrenching his arms behind him without regard for his safety, pushing his face into the rumble strips at the edge of I-26, and causing him to sustain facial lacerations and an injury to his left shoulder. All of this is captured up-close on Lange's dash camera, and the sound is captured on both Lange and Williamson's body cameras.

30.     Tony was never resisting arrest, and the brutal physical force used to detain him was wholly unwarranted under the circumstances. Tony can be seen bleeding profusely onto Lange's patrol car in Lange's body camera footage.

31.     Williamson claimed he observed Tony attempting to crush something under his foot that looked to Williamson like a crack pipe, but no such pipe was collected or placed into evidence, and Tony was not charged with possession of paraphernalia, or any other violation associated with the phantom crack pipe.

32.     After completing the search of the car, Lange claimed to have found two off-white rocklike substances underneath a cushion on the driver's seat, weighing .01 grams. Lange claimed these miniscule white pebbles field tested presumptively positive for cocaine, though no proof of his field test was entered into evidence. Lange charged Tony with possession of cocaine base.

33.     Before Tony could be booked into the Charleston County Detention Center on the possession of cocaine warrant, he had to be treated by EMS who determined that he needed to be seen at Trident Medical Center ("Trident"). At Trident, Tony complained of left shoulder pain and had to receive stitches for the facial lacerations he suffered at the hands of Lange and Williamson. He was also treated at Trident for a closed head injury and had a CT scan of his shoulder, though such a test was not precise enough to diagnose the serious soft-tissue injury he had sustained. His glasses were broken, and his car was towed.

34.     Tony hired a lawyer to defend him in the criminal matter, who requested discovery of the state's evidence and received video and other evidence showing the actions of Lange and Williamson as well as other officers who arrived on the scene later, including supervising officers.

35. Upon reviewing the case file, Assistant Solicitor Richards Hundley promptly dismissed the case, and Tony's arrest was promptly expunged.

36. Prior to March 30, 2020, Tony was working as a handyman for Handyman Connection in North Charleston. After this incident, due to the injury to his shoulder he could no longer accept certain jobs and ultimately could not go on working in that capacity because the pain was too severe. His medical bills went into collections, damaging his credit. Without health insurance, Tony had to wait nearly a year before he could afford to be seen by an orthopedist who requested a contrast MRI and diagnosed his left shoulder pain as a left rotator cuff tear, as a result of having his arm violently wrenched behind his back by Williamson and Lange. He remains in need of surgery that he cannot afford, and, according to his doctor, with each passing day the likelihood of successful repair is diminished.

37. Despite the visible and serious injuries Tony sustained in this incident, no one in the supervisory chain of command above Lange and Williamson conducted an appropriate review of the use of force, and instead the officers were allowed to cover up their misconduct by claiming without evidence that Tony had brought on the incident by attempting to destroy evidence.

38. The conduct of Williamson and Lange was reckless and created a substantial risk of serious harm to Tony Domagala.

39. The conduct of Williamson and Lange violated clearly established federal law and the United States Constitution, including the right to be free from unwarranted searches and seizures, as well as the right to be free from the excessive use of physical force and the right to due process under law.

40. The conduct of Green, Hall, and Burgess, who all supervised Williamson and Lange, and who all failed to adequately train, appropriately supervise, or minimally investigate use of force by Williamson and Lange exhibited a shocking and deliberate indifference to the lives and safety of the general public.

41. The conduct of the City and NCPD represented a pattern and practice of conduct either promoting, condoning, or failing to prevent unlawful traffic stops and violations of community members' constitutional rights to due process, and freedom from the excessive use of physical force.

**FOR A FIRST CAUSE OF ACTION**
**42 U.S.C § 1983 – 14th Amendment Claim of Violation of Due Process**

42. Plaintiff fully incorporates all previous paragraphs.

43. When they violently slammed Tony Domagala into the hood of a patrol car and then threw him to the ground causing serious injuries to his face and shoulder, many minutes into an entirely manufactured traffic stop; with clear evidence Tony was not a threat and did not possess a weapon; without Tony ever exhibiting physical resistance to his continued unlawful detention; Williamson and Lange acted with a conscience-shocking deliberate indifference to Tony's life and safety.

44. Williamson and Lange violated 42 U.S.C. § 1983 while acting under color of law by depriving Plaintiff of the following clearly established and well-settled constitutional rights protected by the Fourteenth Amendment to the U.S. Constitution:

    a. The right to be free of unlawful reckless, deliberately indifferent, and conscience shocking conduct as secured by the Fourteenth Amendment;

    b. The right to be free from deprivation of life, limb, and property, without substantive due process and from state created/enhanced danger, as secured by the Fourteenth Amendment;

    c. And in such other particulars as may be learned through discovery.

45. The conduct of Williamson and Lange was so egregious and so outrageous that it may fairly be said to shock the contemporary conscience.

46. Williamson and Lange either knew or had fair warning that their conduct was unlawful.

47. A reasonable law enforcement officer in the position of Williamson and Lange could never have reasonably believed that their conduct was permissible under established legal standards.

48. As a direct and proximate result of the conscience shocking conduct and deliberate indifference to life of Williamson and Lange, Plaintiff suffered significant bodily injury; has incurred and will continue to incur reasonable and necessary medical expenses; has suffered and continues to suffer a significant lifestyle change; endures continued pain and suffering; has suffered and continues to suffer emotional distress, anxiety, and embarrassment; and has suffered and continues to suffer serious and permanent physical injury, harm, damages, and economic loss.

**FOR A SECOND CAUSE OF ACTION**
**42 U.S.C. § 1983 - Monell**

49. Plaintiff fully incorporates all previous paragraphs.

50. The Chief of Police for the North Charleston Police Department is a municipal official, who is liable for the unconstitutional actions of his employees performed

pursuant to a policy statement or decision officially adopted and promulgated by him or at his direction.

51. The City and NCPD are the employer of Lange, Williamson, Green, and Hall. Chief Burgess is the ultimate supervisor of Lange, Williamson, Green, and Hall.

52. Chief Burgess is the chief policymaker and procedure maker for departmental policies and procedures applied or implemented within the jurisdiction of NCPD.

53. The City, NCPD, and Chief Burgess have, through their acts and omissions, promoted customs, policies, patterns, and practices directed, encouraged, or ratified the constitutional violations and uncorrected policy violations of Lange, Williamson, Green, and Hall, with respect to use of force. The practices of unconstitutional search, seizure, and use of force have become customary within NCPD.

54. The City, NCPD, and Chief Burgess violated 42 U.S.C. §1983 while acting under color in the following respects:

    a. Employing improper patterns and practices relating to the failure to enforce NCPD departmental policies and procedures relating to use of force, which were promulgated and implemented by Chief Burgess and/or his predecessors.

    b. Employing improper patterns and practices relating to the training of employees on Federal and State law relating to use of force.

    c. Employing improper patterns and practices relating to the training of employees on SCSO departmental policies and procedures relating to use of force, which were promulgated, implemented, or executed by Chief Burgess and/or his predecessors.

d. Employing improper patterns and practices relating to supervision of employees with regard to the investigation of violations of Federal and State law relating to lawful searches and seizure and the appropriate use of force.

e. Failing to employ practices to properly investigate use of force incidents in order to cover up the frequency and severity of such incidents, thereby encouraging or failing to discourage future acts of misconduct by officers.

f. Employing improper patterns and practices relating to the failure to appropriately discipline of employees involved in improper use of force incidents that were violative of NCPD departmental policies and procedures relating to use of force, which were promulgated and implemented by Chief Burgess.

g. Employing improper patterns and practices of failing to promulgate, implement, and/or enforce policymaking on behalf of the City of North Charleston regarding use of force.

55. The details of the subject incident have been revealed to the authorized policy-maker Defendants, providing the policy makers with direct knowledge of the improper actions. Notwithstanding this knowledge, the City, NCPD, and Chief Burgess have ignored the improper actions that are the subject of this action, have approved Lange and Williamson's actions, and have made a deliberate choice to endorse through inaction this improper and unconstitutional conduct. By so doing, the City, NCPD, and Chief Burgess have shown affirmative agreement the individual officer defendants' actions and have ratified their unconstitutional actions.

56. As a direct and proximate result, the City, NCPD, and Chief Burgess' patterns and practices relating to use of force incidents, Tony was violently injured and continues to suffer lasting physical pain, lost wages, and loss of enjoyment of life.

57. As a direct and proximate result of the violation of Tony's constitutionally protected rights, he is entitled to recover actual and punitive damages, as set forth above, in an amount to be determined by a jury, as well as reasonable attorney's fees.

### FOR A THIRD CAUSE OF ACTION
### NEGLIGENCE AND GROSS NEGLIGENCE —
### STATE TORT CLAIMS ACT

58. Plaintiff fully incorporates all previous paragraphs.

59. Defendants departed from the duties of care required by law enforcement officers and the agencies that hire, train, and employee them and were, thereby, negligent, careless, grossly negligent, willful, wanton, and reckless, and acted in violation of the duties owed to the Plaintiff, in that they committed one or more of the following acts or omissions, any or all of which were departures from the prevailing duties of care:

   a. In failing to ensure the wellbeing of the Plaintiff;

   b. In failing to appreciate the conditions that existed at the time in question when the subject search and seizure occurred without just cause;

   c. In failing to adhere to proper law enforcement policies, procedures, standards, customs, and protocols;

   d. In failing to exercise appropriate discretion before, during, and after the subject incident and to consider other acceptable applicable methods;

   e. In failing to have in place proper and adequate policies, procedures, standards, and protocols for officer conduct regarding the propriety of

       traffic stops, search and seizure, and use of force; and if such policies, procedures, standards, and protocols were in place, in failing to properly enforce them;

    f. In failing to properly hire, train, monitor, supervise, and/or retrain their employees;

    g. In implementing and executing policies, procedures, standards, protocols, regulations, and customs that ignored and jeopardized the rights and safety of citizens, amounting to a deliberate indifference toward the rights of the Plaintiff;

    h. In acting with deliberate indifference; and

    i. In such other particulars as may be learned through discovery in the action or at trial.

60. As a direct and proximate result of the negligence, carelessness, gross negligence, willfulness, wantonness, recklessness, and departure from the duty of care owed by Defendants to the Plaintiff, the Plaintiff sustained the injuries and damages described herein.

**FOR A FOURTH CAUSE OF ACTION**
**NEGLIGENT SUPERVISION**

61. Plaintiff fully incorporates all previous paragraphs.

62. At all times relevant to this cause of action, Williamson and Green were employees of the City of North Charleston Police Department and were supervised by Chief Burgess, Hall, and Green.

63. Williamson and Green acted in a grossly negligent manner and with reckless disregard for the life and safety of Tony Domagala.

64. Chief Burgess, Hall, and Green knew or had reason to know of their ability to control the actions of Williamson and Lange when they interacted with members of the public.

65. Chief Burgess, Hall, and Green knew or should have known of the need to control the actions of Williamson and Lange, as evidenced by policies and procedures governing the appropriate use of force and the circumstances warranting investigation of incidents of force.

66. As a direct and proximate result of the negligent supervision of Williamson and Lange by Chief Burgess, Green, and Hall, Tony was injured and is entitled to recover actual and punitive damages, in an amount to be determined by a jury, as well as reasonable attorney's fees.

**FOR A FIFTH CAUSE OF ACTION**
**BATTERY**

67. Plaintiff fully incorporates all previous paragraphs.

68. Williamson and Lange violently, abusively, and without provocation inflicted forcible contact on Tony, causing him fear, physical injury, loss of enjoyment of life, lost wages, and other damages.

69. As a direct and proximate result of the Williamson's and Lange's battery of Tony, he was injured and is entitled to recover actual and punitive damages, in an amount to be determined by a jury, as well as reasonable attorney's fees.

## RELIEF REQUESTED

i. Plaintiff requests a jury trial for all claims triable and as to all issues to the extent permitted by law.

ii. Plaintiff asks for judgment against Defendant on all claims and as follows:

   a. For actual damages, according to proof, including incurred and future medical expenses, gratuitous nursing services, and other such damage established by discovery;

   b. For other compensatory damages permitted by law, including damages for physical and mental pain and suffering and alteration of lifestyle;

   c. For punitive damages as determined by the trier of fact, should discovery reveal willful and wanton conduct by Defendant;

   d. For all costs of Court, including reasonable attorney's fees; and

   e. For such other relief as the trier of fact deems just and proper.

    Respectfully submitted,

    BLAZER LAW FIRM
    1037 Chuck Dawley Blvd D100
    Mount Pleasant, SC 29464
    Telephone: (843) 732-4441

By:    */s Cameron Jane Blazer*
    Cameron Jane Blazer
    Federal Bar No: 10131

March 25, 2022